Filed 5/25/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,<br><br>      Defendants and Respondents. | A144500<br><br>(San Francisco City & County<br>Super. Ct. No. CPF-14-513-434) |

This case asks us to decide whether the City and County of San Francisco can compel state universities that operate parking lots in the city to collect city taxes from parking users and remit them to San Francisco. The answer turns on whether the California Constitution's "home-rule provision"—which grants charter cities broad powers, including the power to tax—creates an exception to the long-recognized doctrine that exempts state entities from local regulation when they are performing governmental functions. We conclude that it does not. As a result, we affirm the trial court's denial of San Francisco's petition for writ of mandate.

## I. BACKGROUND

For over 40 years, San Francisco has had an ordinance that imposes a tax on parking lot users for the "rent" paid to occupy private parking spaces in the city. (S.F. Bus. & Tax Regs. Code, art. 9, §§ 602, 606; see *City and County of San Francisco v. Flying Dutchman Park, Inc.* (2004) 122 Cal.App.4th 74, 80.) Since 1980, the amount of the tax has been 25 percent of the rent. (S.F. Bus. & Tax Regs. Code, art. 9, §§ 602, 602.5.) Under the ordinance, parking lot users owe the tax, but parking lot operators are required to collect the tax when the users pay to park. (*Id.*, art. 9, §§ 603, 604, subd. (a).)

1

The operator is required to hold the collected taxes in trust for, and periodically remit them to, San Francisco. (*Id.*, art. 6, §§ 6.7-1, 6.7-2.) If an operator fails to collect a parking tax from a user, the operator is liable for it. (*Id.*, art. 6, § 6.7-1, subd. (d); *id.*, art. 9, § 604, subd. (a).)

The ordinance states it is not to be construed as imposing a tax on the state or its political subdivisions. (S.F. Bus. & Tax Regs. Code, art. 6, § 6.8-1, subd. (a)(2).) Still, these "exempt" entities must "collect, report, and remit" the tax (*id.*, art. 6, § 6.8-1, subd. (b); *id.*, art. 9, § 601, subd. (a)), pay any taxes that they fail to collect (see *id.*, art. 9, § 604, subd. (a)), and comply with various administrative obligations, such as obtaining a certificate of authority to operate a parking lot; maintaining a log of, and bearing the burden of explaining, all lost parking tickets and cancelled transactions (*id.*, art. 9, § 604, subd. (c)); and filing monthly parking tax returns (*id.*, art. 6, § 6.7-2, subds. (b) & (c)).

The defendants, which we will refer to as the universities, are the Regents of the University of California (Regents), which is responsible for the operation of the University of California at San Francisco (UCSF); the Board of Directors of Hastings College of the Law (Hastings); and the Board of Trustees of the California State University (CSU), which is responsible for the operation of San Francisco State University (SFSU). The universities operate parking lots within San Francisco on property that is mostly owned by the state. All of these lots are in close proximity to other university facilities. Students, faculty, administrators, guests, patients at certain medical facilities, and with a few exceptions, members of the general public may pay to park in them.

The universities have never collected or remitted city parking taxes. In 1983, San Francisco tried to recover an alleged parking-tax deficiency from UCSF, but the Regents claimed immunity and San Francisco dropped the matter. The current controversy was prompted almost 30 years later, when in 2011 San Francisco directed the universities to start collecting and remitting the parking tax. After the universities refused, San Francisco petitioned the trial court for a writ of mandate to force compliance. The court denied the writ, ruling that the universities are immune from complying with the

2

ordinance because they have not expressly consented to collecting and remitting the tax and their parking-lot operations are a governmental, not a proprietary, function.

## II. DISCUSSION

### A. *The Standard of Review.*

" 'In reviewing a trial court's judgment on a petition for writ of ordinary mandate [brought under Code Civ. Proc., § 1085], we apply the substantial evidence test to the trial court's factual findings. However, we exercise our independent judgment on legal issues . . . .' " (*City of Oakland v. Oakland Police and Fire Retirement System* (2014) 224 Cal.App.4th 210, 226.) Where, as here, the facts are undisputed, the issue whether a state entity is exempt from complying with a local ordinance presents a question of law that we review de novo. (*Bame v. City of Del Mar* (2001) 86 Cal.App.4th 1346, 1354 (*Bame*); see also *California Public Records Research, Inc. v. County of Stanislaus* (2016) 246 Cal.App.4th 1432, 1443.)

### B. *The Parties' Constitutional Powers.*

San Francisco is a charter city, and as such it has broad powers by virtue of the California Constitution's home-rule provision. (Cal. Const., art. XI, § 5, subd. (a).) These powers include the authority to "make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in [its] several charters." (*Ibid.*) The "power to tax for local purposes clearly is one of the privileges accorded chartered cities by [the home-rule provision]." (*Weekes v. City of Oakland* (1978) 21 Cal.3d 386, 392 (*Weekes*).)

The universities' constitutional powers are similarly substantial. The Regents governs a statewide system of campuses, including UCSF, and is vested with "full powers of organization and government" and has "all the powers necessary or convenient for the effective administration of [the University of California's] trust," including "the management and disposition of the property of the university." (Cal. Const., art. IX, § 9, subds. (a) & (f).) "Article IX, section 9, grants the [R]egents broad powers to organize and govern the university and limits the Legislature's power to regulate either the university or the [R]egents. This contrasts with the comprehensive power of regulation

3

the Legislature possesses over other state agencies." (*San Francisco Labor Council v. Regents of University of California* (1980) 26 Cal.3d 785, 788.)

Hastings is "affiliated with the University of California and is the law department thereof," and it is governed by a Board of Directors appointed by the Governor and approved by the Senate.  (Ed. Code, §§ 92201, 92206.)  Its mission is to "afford facilities for the acquisition of legal learning in all branches of the law."  (*Id.*, § 92202.)

Lastly, CSU is a constitutionally authorized "state agency created by the Legislature in the field of public higher education which is charged with the management, administration, and control of the State College System of California."  (Cal. Const., art. XX, § 23; Ed. Code, §§ 66600 et seq., 89000 et seq.)  The CSU system is governed by a board of trustees.  (Ed. Code, § 66600.)  SFSU is part of this system, and its structure and mission are set forth in state statutes.  (*Id.*, § 89001 et seq.)

C.    *The Doctrine Exempting State Entities from Local Regulation.*

Over 60 years ago, our state Supreme Court held that when the state "engages in such sovereign activities as the construction and maintenance of its buildings, as differentiated from enacting laws for the conduct of the public at large, it is not subject to local regulation unless the Constitution says it is or the Legislature has consented to such regulation." (*Hall v. City of Taft* (1956) 47 Cal.2d 177, 183 (*Hall*).)  Under this doctrine, courts evaluate whether the endeavor in which a state entity is engaged is a "sovereign activit[y]." (*Ibid*.)  If it is, the state entity is exempt from complying with local regulation unless constitutional or statutory provisions provide otherwise.[1]  (*Hall*, at p. 183.)

In the decades since *Hall*, courts have applied the doctrine to bar attempts by local jurisdictions to regulate state entities engaged in governmental activities.  (See, e.g., *Bame, supra*, 86 Cal.App.4th at p. 1357 [state agricultural district's operation of fairground governmental activity and therefore operators contracting with district exempt from local regulation]; *Laidlaw Waste Systems, Inc. v. Bay Cities Services, Inc.* (1996) 43 Cal.App.4th 630, 637-639 (*Laidlaw*) [school district is state agency exempt from city regulations involving trash collection]; *Del Norte Disposal, Inc. v. Department of Corrections* (1994) 26 Cal.App.4th 1009, 1015 ["state prisons are matters of state, not local, concern" and their operations therefore exempt from local ordinance giving exclusive franchise to certain trash hauler]; *City of Santa Ana v. Board of Education* (1967) 255 Cal.App.2d 178, 180 [same as *Laidlaw*].)

---

[1] For years, appellate courts have described this doctrine as an extension of "sovereign immunity," but in our view this description risks creating confusion. Sovereign immunity typically refers to a limit on the ability to recover money damages, which means it is inapplicable to claims, such as those here, seeking equitable relief against state entities.  (See *Western Title Guar. Co. v. Sacramento & San Joaquin Drainage Dist.* (1965) 235 Cal.App.2d 815, 823-824.)  The term also typically refers to the government's immunity from suits brought by those who are governed, or who are at least outside of the governmental structure.  (See *Muskopf v. Corning Hospital Dist.* (1961) 55 Cal.2d 211, 214, fn. 1.)  This suit satisfies neither of these elements: it does not seek money damages, and it is an internal state governmental dispute.  While the doctrine at issue here involves a type of governmental immunity, the law that governs in typical sovereign-immunity contexts is largely inapplicable.

The doctrine has specifically been applied to bar a charter city's attempt to regulate the construction of a university building by the Regents. In *Regents of University of California v. City of Santa Monica* (1978) 77 Cal.App.3d 130, the Court of Appeal cited *Hall* in holding that Santa Monica could not force the Regents to obtain a building permit and pay city inspection fees as a condition for constructing a university building in the city. (*Id.* at p. 136.) In concluding that constructing university buildings is a governmental activity, the court pointed to the constitutional provision that vests the Regents with " 'the legal title and management of [the] property of the University of California' " and gives it "the unrestricted power to take and hold real and personal property for the benefit of the university." (*Ibid.*; see Cal. Const., art. IX, § 9, subd. (f).)

While courts since *Hall* have barred local regulation of state entities engaged in governmental activities, they have allowed local regulation of state entities engaged in proprietary activities. In *Board of Trustees v. City of Los Angeles* (1975) 49 Cal.App.3d 45, the Court of Appeal held that Los Angeles, a charter city, could regulate a circus held on property owned by CSU at Northridge. (*Id.* at p. 47.) The court determined that the doctrine exempting state entities from local regulation was inapplicable because the circus operations were a "revenue-producing activity" that had "no relation to the governmental functions of the university." (*Id.* at p. 50.) Similarly, in *City of Modesto v. Modesto Irrigation Dist.* (1973) 34 Cal.App.3d 504 (*City of Modesto*), the Court of Appeal held that Modesto could require state irrigation districts to collect a tax imposed on users of the districts' electricity because "an irrigation district which manufactures, distributes[,] and sells electrical energy, in competition with public service corporations, is engaged in a proprietary activity." (*Id.* at pp. 506-507.)

Thus, the analytical framework under the doctrine is straightforward: state entities are exempt from otherwise-valid local regulation when they are engaged in governmental activities unless a constitutional provision or statute says they are not exempt. (*Hall, supra*, 47 Cal.2d at p. 183.) While state entities are free to comply voluntarily with local measures to further the public interest, and we expect they often do, they cannot be

6

forced to comply with those measures when they are performing their governmental functions.

> D.     *The Universities Are Exempt from the Ordinance Under the Doctrine Recognized in* Hall.

Applying *Hall*'s analytical framework to the case before us, we conclude that the doctrine exempting state entities from local regulation defeats San Francisco's effort to compel the universities to comply with the ordinance.[2] The universities' parking operations are governmental activities, and the universities are therefore exempt from the ordinance, as it is undisputed that no constitutional provision or statute provides otherwise.

As we have mentioned, the state's exemption from local regulation "is limited to situations where [a state entity] is operating in its governmental capacity" as opposed to engaging in "proprietary activity." (*Bame, supra*, 86 Cal.App.4th at p. 1356.) This distinction between governmental and proprietary activity "remains viable in the context of encroachment of municipal regulations" even though it "is no longer applicable to determine governmental tort liability [under principles of sovereign immunity]," the area in which it developed. (*Ibid.*; 8 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 991.) "The scope of the relevant inquiry is defined by the particular activities in question" and whether they are related to the state entity's governmental purposes. (*Bame*, at p. 1357.)

The trial court found that the universities are furthering governmental purposes in operating their parking lots, and we agree. As the court explained, the undisputed evidence established that providing parking for students, faculty, staff, and visitors is

---

[2] The parties dispute whether San Francisco is seeking to compel the universities to comply with the ordinance's administrative requirements other than the obligations to collect and remit the city parking taxes. We need not resolve this dispute in light of our conclusion that the universities are exempt from complying with the ordinance. Still, we are not as convinced as the dissent seems to be that the burdens San Francisco seeks to impose are necessarily "minimal" or that the universities "will bear no costs of collection."

integral to the universities' educational and, in the case of the UCSF hospitals, clinical purposes.

As to UCSF, the trial court found that the "parking facilities are used for staff, faculty, students, researchers, patients receiving inpatient and outpatient care, and visitors. Parking facilities are critical to UCSF because it is located in a densely populated urban environment and is a very decentralized campus. UCSF's parking facilities are important in meeting [its] clinical and life-safety mission," and "UCSF uses its parking fee revenue to fund a shuttle bus service for students, faculty[,] and staff between its various locations, including San Francisco General and the VA Hospital."

As to Hastings, the trial court found that "[t]he garage provides access to the campus"—which "is located in an urban area with limited street parking"—"for students, faculty, staff, [and] others who attend events [there]." The garage also "plays an important role in . . . Hastings'[s] effort to maintain a safe and secure environment for its students. The . . . library is open until 11:00 p.m. and even later during finals," and "[t]he garage provides a safe, well-lit[,] and convenient way to leave the campus and encourage continued use of the library and other school facilities for study purposes."

Finally, as to CSU, the trial court found that "the operation of nine parking facilities on the SFSU campus constitutes an activity that is integral to CSU's educational mission and bears a direct and necessary relationship to its functioning. [SFSU] is located in an urban environment where available parking for students, staff[,] and visitors in scarce. Each of CSU's parking stations provides ready access to campus facilities for those who cannot use public transportation to get there. The parking stations are also used by visitors to the [SFSU] campus for the purposes of attending meetings, lectures, arts performances[,] and other educational events."

In challenging the trial court's determination that the operation of the universities' parking lots is a governmental activity, San Francisco contends that "[t]he essential question in the analysis . . . is whether the municipal provision regulates the 'main purpose' of the [state] agency." (Quoting *City of Modesto, supra*, 34 Cal.App.3d at p. 507.) It argues that the universities' "main purpose is not to provide parking, let alone

8

paid parking," but "is education. The tax here, however, is not on the education of undergraduates, training in medicine, training in law, or the like. It is on paid parking."

We reject San Francisco's cramped view that the universities' governmental role is to provide education but nothing related to it. To be sure, we agree with San Francisco that an activity is not necessarily governmental just because it generates revenue used to support a state entity's purpose. (See, e.g., *Board of Trustees v. City of Los Angeles, supra*, 49 Cal.App.3d at pp. 47, 49-50; *City of Modesto, supra*, 34 Cal.App.3d at p. 507.) But operating university parking lots is not simply a revenue-generating endeavor; it is an activity that directly supports the universities' educational and clinical functions by enabling students, staff, and visitors to access university programs and facilities.

Even if operating parking facilities might fall outside the governmental mission of some state entities, it is within the mission of the universities. All of them are directly or indirectly empowered to operate parking facilities by constitutional or statutory provisions that allow them generally to manage their facilities and real estate or specifically to provide parking. (Cal. Const., art. IX, § 9, subd. (f) [Regents vested with "management . . . of . . . property"]; Ed. Code, §§ 89701, subd. (a) [CSU "authorized to . . . construct, operate, and maintain motor vehicle parking facilities"], 92202 [Hastings "shall afford facilities" for legal learning].)

Because the universities' parking operations support the universities' educational and clinical programs and are directly or indirectly authorized by constitutional or statutory provisions, we reject San Francisco's argument that they are a proprietary activity falling outside the doctrine exempting state entities from local regulation.

E. *There Is No Exception to the Doctrine Exempting State Entities from Local Regulation for Charter Cities' Tax-related Measures.*

San Francisco maintains that *Hall*'s analytical framework is inapplicable because the ordinance's collection-and-remittance requirement is not "regulatory" but is instead a "revenue measure." Although San Francisco does not dispute that the universities are exempt from paying local taxes themselves, it contends that the home-rule provision confers on charter cities the authority to require state entities to undertake "reasonable

9

measures" to collect and remit local taxes. In other words, San Francisco asserts that, even though state entities are exempt from local taxes and local regulatory measures, they are not exempt from local measures requiring them to collect and remit taxes. We are not persuaded. San Francisco's argument draws from the law governing state preemption, but that law is largely inapplicable, and even under that law, the distinction between tax and regulatory measures has been abandoned. Our state Supreme Court has never endorsed extrapolating such a distinction to the doctrine exempting state entities from local regulation, and we decline to do so for the first time here.

We begin by reiterating our agreement with San Francisco that the home-rule provision confers broad powers on charter cities. "Charter cities are specifically authorized by our state Constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs." (*State Building and Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 555.) The home-rule provision "represents an 'affirmative constitutional grant to charter cities of "all powers appropriate for a municipality to possess . . ." and [includes] the important corollary that "so far as 'municipal affairs' are concerned" charter cities are "supreme and beyond the reach of legislative enactment." ' " (*Id.* at p. 556; see *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 11-18 (*California Federal*).) As we have observed, these broad powers include the power to tax. (*Weekes, supra*, 21 Cal.3d at p. 392.)

But no Supreme Court case has intimated, and no Court of Appeal decision has directly held, that these broad powers trump the doctrine exempting state entities from local regulation. At least two Court of Appeal cases have explicitly held that they do not. In the first, *Laidlaw, supra*, 43 Cal.App.4th 630, the plaintiff argued that the home-rule provision authorized charter cities to regulate state entities engaged in governmental activities so long as the cities were regulating matters pertaining to municipal affairs, in that case garbage collection. In emphatically rejecting the argument, the Court of Appeal stated,

10

"[This] argument confuses the issues of preemption and sovereign immunity. The issue . . . is not [as it would be under preemption analysis] whether the City has [authority under the home-rule provision] over garbage collection within its city limits. Unquestionably, local governments have that authority . . . . [Citations.]

The issue here is not preemption; the issue is whether state agencies are exempt from local trash collection regulations under the doctrine of sovereign immunity. *Hall*, *City of Santa Ana*, and *Del Norte* make clear state agencies are indeed immune from such local regulation absent an express legislative or constitutional waiver of that immunity. Since the question is one of immunity, not preemption, it makes no difference whether the local governmental entity is a charter city as opposed to some other form of local government. The sovereign immunity of a state agency from local regulation *does not depend upon the source of the local governmental entity's authority to make regulations*, it depends upon whether consent to regulation has been expressly stated by the Legislature or in the state Constitution."

(*Laidlaw*, at pp. 638-639, italics added.) *Laidlaw*'s holding that charter cities' powers under the home-rule provision do not overcome state entities' exemption from local regulation was decisively confirmed in *Bame*. Quoting *Laidlaw* at length, *Bame* repeated that the source of a city's authority is irrelevant to the analysis. (*Bame, supra*, 86 Cal.App.4th at pp. 1355-1356.)

We take a moment to briefly discuss preemption because, as did the plaintiffs in *Laidlaw* and *Bame*, San Francisco and the dissent conflate principles of preemption with the doctrine exempting state entities from local regulation. " 'Under article XI, section 7 of the California Constitution, "[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general [state] laws." [¶] "If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void." [Citations.] [¶] "A conflict exists if the local legislation ' "duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication." ' " ' " (*O'Connell v. City of Stockton* (2007) 41 Cal.4th 1061, 1067, italics omitted.) The consequence of the preemption of a local measure is that the measure is unenforceable against *anyone*. In contrast, the

11

consequence of the application of the doctrine exempting state entities from local regulation is that the measure is unenforceable only against *state entities*. Thus, the law governing preemption has little to do with the doctrine exempting state entities from local regulation. Preempted local measures are unenforceable against state entities because they are void, not because of anything having to do with these entities' governmental status.

Until our state Supreme Court stepped in, some appellate courts had treated charter cities' tax measures as different from, and weightier than, other regulatory measures in considering whether they were unenforceable against anyone because they conflicted with, and were therefore preempted by, state law. (*California Federal, supra*, 54 Cal.3d at pp. 13-14.) *California Federal* rejected this distinction and held that both types of measures, tax and non-tax, are subject to the same preemption analysis, which requires courts to focus on whether an actual conflict exists between the local measure and the state's governance in the field. (*Id.* at p. 7.) The Court explained, "In the event of a true conflict between a state statute reasonably tailored to the resolution of a subject of statewide concern and a charter city tax measure, the latter ceases to be a 'municipal affair' to the extent of the conflict and must yield." (*Ibid.*) The heart of *California Federal*'s holding was that a charter city's measure, whether tax-related or regulatory in some other sense, is void under the law of state preemption only if it truly conflicts with state law. Since *California Federal*, courts reviewing a charter city's measure to determine whether it is preempted consider the extent to which it conflicts with state law, regardless of whether the measure is tax-related.

The two main cases that San Francisco relies on in urging us to adopt the distinction between tax-related and other local measures are Court of Appeal decisions announced before *California Federal* and involving circumstances far different than those presented here. *Oakland Raiders v. City of Berkeley* (1976) 65 Cal.App.3d 623 involved a Berkeley ordinance requiring private businesses pay a gross-receipts tax. (*Id.* at p. 626.) The Court of Appeal held that this tax could be imposed on a private business even though the business leased property from the University of California. Referring to

12

the pre-*California Federal* distinction between tax and other local measures, the court stated that "whether or not the state law has occupied the field of regulation, cities may tax businesses carried on within their boundaries," including a business that is a "lessee of publicly owned property." (*Id.* at pp. 626-627.) Similarly, *City of Los Angeles v. A.E.C. Los Angeles* (1973) 33 Cal.App.3d 933 authorized a charter city, Los Angeles, to impose a gross-receipts tax on a private business that was performing contract work for the state because there was no "state statutory scheme which preempt[ed] the area of taxation in which the City business tax operate[d]." (*Id.* at pp. 939-940.) The holdings in these cases do not apply to the case at hand. The issue here is whether the universities are exempt from collecting and remitting the parking tax, not whether third parties can avoid the tax by virtue of their business relationship with the universities or principles of state preemption.

In arguing that charter cities' power to tax under the home-rule provision authorizes charter cities to require state entities to collect and remit taxes, San Francisco and the dissent also rely on an alternative rationale used by the Court of Appeal in reaching its holding in the decades-old case of *City of Modesto, supra*, 34 Cal.App.3d 504. In our view, that reliance is misplaced. In *City of Modesto*, Modesto, a charter city, imposed a tax on users of water, gas, electricity, and telephone services and required providers of those services to collect the tax. (*Id.* at p. 506.) As a consequence, the city sought to compel two state irrigation districts that sold electricity to city users to collect the tax. (*Id.* at pp. 505-506.) Although the districts conceded that the city had the power to impose the local tax on its residents, they claimed that they were not required to collect those taxes because if that power were "extended to state agencies, [it would] contravene[] the almost universal rule . . . that the activities of the state and its agencies cannot be controlled or regulated by local entities in the absence of legislative consent." (*Id.* at p. 506.)

The Court of Appeal first determined that the irrigation districts were not exempt from the city's regulation because our state Supreme Court had previously held, in two separate cases, that (1) irrigation districts selling electricity on the open market are

13

engaged in a proprietary activity and (2) an ordinance requiring a utility to collect a city tax on users is not invalid under preemption principles because it does not "constitute forbidden or conflicting regulation of the utility."  (*City of Modesto, supra*, 34 Cal.App.3d at pp. 506-507; see *Rivera v. Fresno* (1971) 6 Cal.3d 132, 139; *Yolo v. Modesto Irrigation Dist.* (1932) 216 Cal. 274, 278.)  If both of these propositions were true, the Court of Appeal asked, "how can it be argued plausibly that the collection requirement of [Modesto's] ordinance, if applied to that proprietary activity, is regulation which impinges on the state's sovereignty[?]"  (*City of Modesto*, at p. 507.)  This analysis, to which we subscribe, comports with *Hall* by recognizing that state entities engaged in proprietary activities are subject to local regulation.

But *City of Modesto* went on to offer an alternative rationale in support of its holding that does not comport with *Hall* and to which we do not subscribe.  In this alternative rationale, the Court of Appeal explained that a charter city's power to "levy a utility user's tax is a municipal affair and stems from the Constitution" and carries with it the "the corollary power to use reasonable means to effect [the tax's] collection."  (*City of Modesto, supra*, 34 Cal.App.3d at p. 508.)  The court then determined that Modesto's constitutionally grounded powers took precedence over the irrigation districts' statutorily grounded state sovereignty, stating, "It is . . . basic that if there is a conflict between the California Constitution and a law adopted by the Legislature, the California Constitution prevails.  While irrigation districts may be state agencies, they are nevertheless creatures of the Legislature, and like the Legislature must submit to a constitutional mandate; the California Constitution is the paramount authority to which even sovereignty of the state and its agencies must yield.  It follows that the collection requirement of [Modesto's] ordinance, though applicable to state agencies, is a reasonable exercise of [Modesto's] constitutional power to tax for revenue purposes."  (*Ibid.*)  This rationale, in other words, was premised on the notion that a charter city's constitutional authority under the home-rule provision should be weighed against and take precedence over statutory authority conferred on a state entity.

14

*Laidlaw* and *Bame* squarely, and in our view properly, rejected this premise. As those two decisions explained, what matters is not the source of a local agency's authority, but instead whether, under *Hall*'s analytical framework, the state entity is engaged in a governmental activity and whether consent to local regulation has been conferred by a statute or constitutional provision. (*Bame, supra*, 86 Cal.App.4th at pp. 1355-1356; *Laidlaw, supra*, 43 Cal.App.4th at pp. 638-639.) *City of Modesto*'s alternative rationale exacerbated the error of focusing on the source of the city's authority, i.e., the home-rule provision, by then weighing that authority against the state entities' statutory authority. We have found no other cases that have taken such an approach, and we decline to adopt it here.

Furthermore, even if we were to accept the alternative rationale's premise that a city's constitutional authority trumps a state entity's statutory authority, we still would not be compelled to sanction San Francisco's effort to impose the ordinance's requirements on the universities. The irrigation districts' authority in *City of Modesto* was based on statutes, but the universities' authority here is derived from the Constitution. Thus, even if the proper analysis did involve a weighing of the local agency's authority against the state entity's authority, we would not necessarily conclude that San Francisco's constitutional authority trumps the universities' constitutional authority.

We are similarly unimpressed with dicta in *Eastern Mun. Water Dist. v. City of Moreno Valley* (1994) 31 Cal.App.4th 24, upon which both San Francisco and the dissent rely. In *Moreno Valley*, the Court of Appeal permitted a non-charter city to require a municipal water district—i.e., a non-state entity—to collect and remit a utility tax after determining that the district had waived any sovereign immunity that it might possess. (*Id*. at pp. 25, 30.) The court did not need to go any further to conclude that the district was therefore subject to the city's regulation. Nevertheless, after noting that the district's sole argument was that the city, a general law city, "lacked the statutory authority" to require the district to collect the tax, the court referred to *City of Modesto*'s alternative rationale in remarking that the " 'power to tax carries with it the corollary power to use

15

reasonable means to effect its collection' " regardless of the source of that power. (*Id.* at pp. 28-30.) This passage has no bearing on the case before us. While we have no quarrel with the principle that a city's authority to impose a tax generally carries with it the corollary power to collect the tax, that principle has nothing to do with whether any such corollary power can be used to force *a state entity* to collect and remit local taxes against its will when it is engaged in a governmental activity.[3] *Moreno Valley* did not involve a comparison of the source of a city's authority with the source of a state entity's authority. Just because a city has the general power to collect a tax does not mean it has the power to force a state entity to collect that tax on the city's behalf.

Finally, we recognize that in *Weekes* our state Supreme Court mentioned the state's participation in collecting and remitting certain local taxes. There, taxpayers challenged an " 'employee license fee' " that Oakland, a charter city, imposed on people who worked in the city for the "privilege of engaging in or following any business, trade, occupation or profession as an employee." (*Weekes, supra*, 21 Cal.3d at pp. 390, 415.) "Although the employee [was] the actual taxpayer, . . . employers [were required] to collect the license fee by withholding tax from each employee's paycheck." (*Id.* at p. 391.) At the end of its opinion, after rejecting the taxpayers' contention that the fee was "essentially a municipal income tax" prohibited by statute, the Court commented that Oakland was "not barred from imposing its license tax upon state employees who work within the city." (*Id.* at pp. 390, 398.)

In our view, the dissent reads far too much into this comment. As support for the remark, *Weekes* cited only *Graves v. N.Y. ex rel. O'Keefe* (1939) 306 U.S. 466, 486-487 (*Weekes, supra*, 21 Cal.3d at p. 398), in which the United States Supreme Court held that federal employees were not immune from state income tax because there was no "basis

---

[3] San Francisco and the dissent also rely on an opinion by the Attorney General (65 Ops.Cal.Atty.Gen. 267 (1982)) that cited *City of Modesto*'s alternative rationale in concluding that a charter city could require an agent of the state to collect a local occupancy tax. We reject the opinion's reasoning because it also fails to acknowledge the distinction between a charter city's power to impose a local tax and its power to force a state entity to collect that tax.

for the assumption that any . . . tangible or certain economic burden is imposed on the government . . . as would justify a court's declaring that the taxpayer is clothed with the implied constitutional tax immunity of the government by which he [or she] is employed." (*Graves*, at p. 486.)  Thus, *Weekes*'s comment addressed whether state employees might be charged the license tax, not whether the state was exempt from local regulation or could instead be forced to collect and remit those taxes.  *Weekes* is silent on the effect of the doctrine exempting state entities from local regulation, and " 'it is axiomatic that cases are not authority for propositions not considered.' "[4] (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1160.)

In conclusion, although San Francisco has broad powers under the home-rule provision, including the power to tax, the doctrine exempting state entities from local regulation prevents San Francisco from forcing the universities to collect and remit city taxes imposed on users of the universities' parking facilities.  Unlike the dissent, we do not consider the law in this area to be in a state of disarray, and we see no need to craft a judicial exception to the doctrine.  While there may be a value in having state entities collect and remit charter-city taxes, the doctrine incorporates readily available methods to implement any such value:  state entities can voluntarily collect and remit those taxes, or the Legislature can tell them they must.

### III. DISPOSITION

The judgment is affirmed.  The parties shall bear their own costs on appeal.

---

[4] We are similarly not persuaded by the dissent's discussion of federal cases involving the federal government, states, and Indian tribes that permit the imposition of a "minimal burden" related to taxes.  These cases have nothing to do with the California-law doctrine exempting state entities from local regulation, and there is no reason to look to them for guidance.

_____

Humes, P.J.


I concur:


_____

Margulies, J.


*City and County of San Francisco v. Regents of the University of California et al.*
(A144500)

**DISSENTING OPINION BY BANKE, J.**


With the majority's opinion, the law on whether a municipality can ask a state entity to collect a *general* local tax imposed *not* on the state entity, but on third parties doing business with the entity, is as follows:  Irrigation districts providing electrical service (a proprietary activity because non-state entities also produce electricity) can be required to collect a local utility users tax.  (*City of Modesto v. Modesto Irrigation Dist.* (1973) 34 Cal.App.3d 504 (*City of Modesto*).)  Water districts providing water and sewer services (both governmental functions [Wat. Code, §§ 71610, 71670]) can be required to collect a local utility users tax.  (*Eastern Mun. Water Dist. v. City of Moreno Valley* (1994) 31 Cal.App.4th 24, 26 (*Eastern Mun. Water*).)  The State Parks Department can be required to collect a local occupancy tax imposed on those using its Asilomar conference center (with no determination of whether this historic and required use of the state's property is a proprietary activity or governmental function). (65 Ops.Cal.Atty.Gen. 267 (1982).)  In addition, a city can impose a local privilege tax on all employees working within its municipal boundaries, including state employees (at least some of whom are presumably performing governmental functions), pursuant to an ordinance that requires employers, including the state, to collect the tax.  (*Weekes v. City of Oakland* (1978) 21 Cal.3d 386 (*Weekes*).)  However, the majority concludes that the state universities cannot be asked to collect a local parking tax imposed on third parties paying to use the schools' parking facilities.[1]

Certainly the prior cases differ in varying respects from the case at hand, as the majority points out.  But these differences do not, independently or collectively, provide a cogent legal framework that explains how the *results* in the prior authority—allowing a municipality to look to a state entity for help in collecting a general local tax imposed on

---

[1]  I have not included *Bame v. City of Del Mar* (2001) 86 Cal.App.4th 1346 (*Bame*), in this litany because, as I shall discuss, the appellate court, in barring enforcement of two local revenue measures, treated the challenged fee and tax as imposed *on* the state entity, itself.

third parties—can exist in harmony with the *result* here, disallowing such help unless the state entity consents to provide it. I do not see how, for example, water districts can continue to be required to collect local utility taxes on users of water and sewer services in the wake of the majority's opinion, unless these districts agree to do so.

The majority grounds its conclusion that the state universities need not collect San Francisco's parking tax on *Hall v. City of Taft* (1956) 47 Cal.2d 177 (*Hall*) and its progeny, the rationale being that requiring the universities to collect the tax would be an impermissible regulation of the universities' use and maintenance of their property (a governmental function). I certainly agree San Francisco cannot tell the universities, for example, how much of their property they can use for parking, or how much they can charge, or how they can spend their parking revenue. However, in my view, whether the universities can be asked to collect a general local tax imposed on third parties doing business with the schools presents a different question, particularly where the universities will not bear the cost of collection and, thus, there will be no impingement of their sovereign resources.[2] I also think the answer to this question is better informed by those cases addressing the scope of a municipality's power to tax third parties, than it is by the cases addressing the state's exemption from local regulation of its governmental functions.

There is no question, however, that the law on whether a municipality can look to a state entity to collect a general local tax imposed on third parties has been far from a paragon of clarity. Respectfully, the majority's opinion leaves the law in some disarray. Yet municipalities need to know with some assurance whether third parties who do

_____

   [2]  The City has expressly stated it is not seeking to compel the universities to comply with the administrative and regulatory provisions of its parking tax ordinance, nor is it seeking to subject the universities to the ordinance's penalty provisions. While the universities have objected to this representation by the City, there is no impediment to the City limiting, or abandoning portions of, the writ relief it seeks. (See S.F. Bus. & Tax Regs. Code, § 6.23-1 [provisions of parking tax ordinance are severable]; *City of Modesto*, *supra*, 34 Cal.App.3d at p. 509 [suggesting severable penalty provision of local utility tax ordinance might not be enforceable against state entity, but declining to reach issue].)

2

business with a state entity will essentially receive a pass on a general local tax. It is time for our Supreme Court to squarely address this issue and to state clearly whether or not a state entity can be asked to collect a local tax imposed on third parties doing business with the entity, particularly where, as here, the entity will be reimbursed its costs of doing so.

***The Exempt from Local Regulation Cases*[3]**

In *Hall*, the case undergirding the majority's decision, a general law city ordered work stopped on a public school project, insisting the school district's contractor comply with its local building ordinance, which included permit and fee requirements. (*Hall*, *supra*, 47 Cal.2d at p. 179.) The school district had already secured review and approval of its construction plans through the State Department of Education and State Division of Architecture. (*Ibid.*) The contractor sued the city, seeking an injunction. The city claimed, in turn, it had the power to enact and enforce local building regulations under its police powers. (*Ibid.*)

Our Supreme Court held the "public schools of this state are a matter of statewide rather than local or municipal concern" and therefore state "legislative enactments thereon control over attempted regulation by local government units." (*Hall*, *supra*, 47 Cal.2d at pp. 179, 181.) "When [the state] engages in such sovereign activities as the construction and maintenance of its buildings, as differentiated from enacting laws for the conduct of the public at large, it is not subject to local regulations unless the Constitution says it is or the Legislature has consented to such regulation." (*Id.* at p. 183.)

---

[3] I discuss the exempt from local regulation cases and the third party tax cases separately because they involve *different* factual scenarios and discuss *different* legal principles, as the following overview of these cases makes clear. This in no way contradicts our Supreme Court's holding in *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1 (*California Federal*), that no distinction is to be drawn between local tax measures and local regulatory measures when engaging in a *preemption* analysis. As the majority states, there is no preemption issue before us. Rather, the issue here is whether requiring the state universities to collect the City's general parking tax imposed on third parties would impermissibly impinge on the schools' sovereignty, and specifically on their control and maintenance of their property.

The high court in *Hall* quoted extensively from its earlier decision in *In re Means* (1939) 14 Cal.2d 254 (*Means*), in which a state worker employed as a plumber at the state fairgrounds, had been arrested for violating a charter city ordinance requiring all journeyman plumbers to obtain a registration certificate. Thus, the issue was "whether a state employee, working entirely on state property, may be punished for his failure to comply with the municipal requirement." (*Id.* at p. 255.) The state employee claimed the state had "occupie[d] the field" of state employment and the local ordinance could not be applied "in derogation of sovereignty." (*Id.* at p. 257.) The charter city maintained it was empowered to regulate local construction. (*Id.* at p. 256.)

The Supreme Court agreed with the state employee. "There can be no question concerning the power of the state . . . to lay down the qualifications for its employees. It acts in an exclusive field [citations], and is not subject to the legislature enactments of subordinate governmental agencies." (*Means*, *supra*, 14 Cal.2d at p. 258.) A "municipal affair" is not, explained the court, "entirely a geographical one" (i.e., the bounds of a city), and "an act relating to property within a city may be of such general concern that local regulation concerning municipal affairs is inapplicable." (*Id.* at p. 259.) The court quoted from a Kentucky case in which a city had tried to regulate fire escapes on buildings at a state institution for the blind. (*Ibid.*) " 'The municipal governmental is but an agent of the state—not an independent body. . . . How can a city have ever a superior authority to the state over the latter's own property or in its control and management? From the nature of things it cannot. . . .' " (*Ibid.*) The *Means* court thusly summarized the outcome in the case before it: "The result is a direct conflict of authority. Either the local regulation is ineffective or the state must bow to the requirement of its governmental subsidiary. Upon fundamental principles, that conflict must be resolved in favor of the state." (*Id.* at p. 260.)

*Hall's* language, including its quotations from *Means*, is an amalgam of what is now considered preemption (e.g., "a matter of statewide rather than local or municipal concern") and sovereign immunity (e.g., "not subject to local regulations unless the Constitution says it is or the Legislature has consented to such regulation") terminology.

4

In my view, both *Hall* and *Means* are best characterized as early cases addressing the scope of "municipal affairs," over which local municipalities (whether a general law or a charter city) have extensive control, and distinguishing such affairs from matters of "statewide concern," as to which the state has paramount control.

*Hall's* progeny have, thus, focused on the distinction between municipal affairs and matters of statewide concern. In *City of Santa Ana v. Board of Education* (1967) 255 Cal.App.2d 178 (*City of Santa Ana*), for example, the appellate court, relying on *Hall*, held the city (not identified as either a charter or general law city) could not require the local school district to employ the city's garbage collector. (*Id.* at pp. 179–180.) The court rejected the city's proffered distinctions between local regulations that directly or indirectly affect internal or external control. The test under *Hall* as to whether "local regulations may control state maintenance of state buildings," said the court, is "whether the Constitution or Legislature has consented to such regulation . . . ." (*Id.* at p. 180.)

In *City of Orange v. Valenti* (1974) 37 Cal.App.3d 240 (*City of Orange*), a city (not identified as either a charter or general law city) sued both the state and the owner of a building the state leased to enforce several local ordinances, including a parking ordinance controlling the number of off street spaces. Citing *Hall*, the Court of Appeal ruled "[w]hen the state engages in such sovereign activities as the construction and maintenance of its buildings (and leasing of the building is no different), it is not subject to local regulations unless the Constitution says it is or the Legislature has consented to such regulations." (*Id.* at p. 244.) "If the ordinance were applicable, and if more spaces are required than are provided, the use of the building as an unemployment insurance office would have to be curtailed. This would have the effect of limiting the state's sovereignty by local regulations, which is prohibited by *Hall* . . . ." (*Ibid.*) The court went on to conclude the state had not expressly consented to the applicability of the local regulations. (*Id.* at p. 245.) As for the requirement that the state's consent must be explicit, the court explained: "A stronger reason for holding that the Legislature's consent must be expressed in a statute can be drawn from the analogy to the state's

5

sovereign immunity from damage claims.  This immunity stems from the sovereignty of the state, as does the exemption from local regulations." (*Ibid.*)

Thus, *City of Orange* is among the earlier cases describing the state's paramount authority in matters of statewide concern as an aspect of its sovereign immunity, and in subsequent cases addressing the extent to which the state is exempt from local regulation, the appellate courts have routinely used sovereign immunity terminology.[4]

In *Board of Trustees v. City of Los Angeles* (1975) 49 Cal.App.3d 45 (*Board of Trustees*), for example, both the state university and a circus performing on the university's property were cited for violating a charter city's ordinance on circuses, which required, among other things, that circuses obtain a permit and pay a fee. (*Id.* at p. 47.)  The university sued for declaratory relief, claiming "activities conducted upon the university's property were not subject to" local regulation. (*Id.* at p. 48.)  The appellate court held the circus was subject to the ordinance, breaking its analysis into two parts, sovereign immunity and preemption.

The court rejected the university's sovereign immunity claim on the ground that in leasing its property to the circus, the university was engaged in "proprietary activity" and was not "operating in a governmental capacity." (*Board of Trustees*, *supra*, 49 Cal.App.3d at p. 49.)  "The state of the law in the field of tort liability notwithstanding, . . . the doctrine of sovereign immunity remains viable.  However, we believe that the previously well recognized distinction between governmental and proprietary activity [citations] serves to limit that immunity to the situation where the state is operating in a governmental capacity." (*Ibid.*)  The court viewed *Hall*, *Means*, and *City of Orange* as examples "in which the state was clearly acting in its governmental capacity" (although later in its opinion, the court characterized *Hall* as being based

_____

[4]  While I have no quarrel with the majority's observation that sovereign immunity often is interposed as a legal defense to a damages lawsuit, I do not agree with its suggestion that the state's exemption from local regulation of its governmental functions is merely a judicially created "doctrine" and not a consequence of the state's sovereignty.  Rather, in my view, the state is exempt from local regulation of its governmental functions, unless it consents thereto, *because* of its sovereign status.

6

"primarily" on preemption). (*Id.* at pp. 50–51.) The court further observed the university's state sovereign immunity ought not to extend to "private entrepreneurs who are involved in the local commercial market where their competitors are subject to local regulation." (*Id.* at p. 50) Indeed, in the lease, the university had "specifically disavowed any governmental status for its lessee." (*Ibid.*) The court then turned to preemption and, distinguishing *Hall*, concluded there was no statutory scheme pertinent to the university that purported to vest control of circus performances exclusively in the state. (*Id.* at pp. 50–52.)

*Board of Trustees* is, thus, one of the earlier cases drawing a clear distinction between sovereign immunity and preemption analyses, and ruling explicitly that sovereign immunity applies only when the state is acting in its "governmental capacity" and does not apply to the state's "proprietary activities."

In *Regents of University of California v. City of Santa Monica* (1978) 77 Cal.App.3d 130 (*Santa Monica*), the University of California, which leased and wanted to improve property for "educational purposes," sued a charter city after the city claimed the university had to obtain a local building permit and pay permit fees. Accordingly, this case was very similar to *Hall*, except that it involved a charter city and the Regents of the University of California. The court first ruled the Regents has every bit as much autonomy over its own affairs as does the state with respect to local school districts—the Regents is " 'a branch of the state itself' " having "virtual autonomy in self-governance." (*Id.* at p. 135, quoting *Pennington v. Bonelli* (1936) 15 Cal.App.2d 316, 321.) And, "[i]n view of the virtual plenary power of the Regents in the regulation of affairs relating to the university and the use of property owned or leased by it for educational purposes," the court held it is "not subject to municipal regulation," citing to *Hall*. (*Santa Monica*, at p. 136.) The court next rejected the city's invocation of its charter status. "[T]he authority of a charter city to regulate municipal affairs is not plenary [citation]. The California Constitution (Cal. Const., art. XI, § 7) does not authorize municipalities to apply local zoning restrictions to state agencies [citation], a power that can be granted only by legislative consent." (*Santa Monica*, at p. 136.)

7

In *Del Norte Disposal, Inc. v. Department of Corrections* (1994) 26 Cal.App.4th 1009 (*Del Norte Disposal*), the company having the exclusive garbage contract with the local waste authority sued the state and its garbage collector for Pelican Bay State Prison. Citing to *Hall*, the court reiterated that when the state " 'engages in such sovereign activities as the construction and maintenance of its buildings, . . . it is not subject to local regulations unless the Constitution says it is or the Legislature has consented to such regulation.' " (*Id.* at p. 1012.) And citing to *Board of Trustees*, the court reiterated that because the state's " 'immunity from local regulations is merely an extension of the concept of sovereign immunity' [citation], the consent to waive immunity must be stated in 'express words.' " (*Id.* at p. 1013.) The court held no such express waiver appeared in the state Integrated Waste Management Act (Pub. Resources Code, § § 40000, 40050 et seq.). (*Del Norte Disposal*, at pp. 1013–1015.)

This brings me to *Laidlaw Waste Systems, Inc. v. Bay Cities Services, Inc.* (1996) 43 Cal.App.4th 630 (*Laidlaw*), the most recent exempt from local regulation case relied on by the majority. In that case, a charter city issued a cease and desist order to a school district's garbage company, and the city's garbage company, in turn, sued the school district's garbage company for declaratory and injunctive relief. (*Id.* at p. 634.) The court cited to *Hall* for the proposition that the " 'public schools of this state are a matter of statewide rather than local or municipal concern,' " and to *Del Norte* for the proposition that "[s]tate agencies, including school districts, enjoy immunity from local regulation unless the state, through statute or provision of the California Constitution, has consented to waive such immunity." (*Id.* at p. 635.) "Like state prisons, the public schools of this state are a matter of state, not local concern," and "[s]pecifically, the state's maintenance of its buildings is a sovereign activity not subject to local regulation absent legislative or constitutional consent to local regulation." (*Id.* at p. 637.) The court held there was no such consent in any legislative enactment or constitutional provision, including in the state Integrated Waste Management Act. (*Id.* at pp. 636–637.)

The *Laidlaw* court also ruled, as had the court in *Santa Monica*, that the city's charter city status was immaterial. "Laidlaw's 'home rule' argument," said the court,

"confuses the issues of preemption and sovereign immunity. The issue in this case is not whether the City has 'home rule' authority over garbage collection within its city limits. Unquestionably, local governments have that authority. . . ." (*Id.* at p. 638.) However, "[t]he issue here is not preemption; the issue is whether state agencies are exempt from local trash collection regulations under the doctrine of sovereign immunity," and "*Hall*, *City of Santa Ana*, and *Del Norte* make clear state agencies are indeed immune from such local regulation absent an express legislative or constitutional waiver of that immunity." (*Ibid.*)

These exempt from local regulation cases address, sometimes with a lack of analytical clarity, a number of issues, including what constitutes a municipal affair or a matter of statewide concern, sovereign immunity, and preemption. All of the cases holding that local regulations were inapplicable to the state (or a state entity) involved situations where the municipality was attempting to exert regulatory control *directly over the state* (or a state entity or state agent). The one contrary case, allowing local regulatory control, differed in two respects—it involved direct regulatory control of a third party (a lessee who expressly was not an agent of the state university) and it involved proprietary activity by the university (leasing its property for a circus show), rather than a governmental function.

In my view, the question before us is a more nuanced one—whether a municipality can look to a state entity to collect a general local tax imposed, not on the state entity, itself, but on third parties transacting business with the entity, and particularly where, as here, the state entity will not bear the costs of collection. I also think the line of cases addressing, specifically, the scope of municipal taxing power, is more helpful in answering this question.

***The Third Party Tax Cases***

While many cases have addressed the bounds of municipal taxing power, *Ainsworth v. Bryant* (1949) 34 Cal.2d 465 (*Ainsworth*) provides a sensible starting point for purposes of the issue before us. In *Ainsworth*, a liquor retailer challenged a charter city's local sales tax, claiming it was invalid as to such retailers because liquor sales were

9

exclusively regulated by the state.  Our Supreme Court rejected the retailer's claim, explaining that the "constitutional provision removing the licensing and regulation of the liquor business from the realm of a municipal affair to that of a matter of general state-wide concern" did not impair the "plenary power of taxation possessed by a chartered municipality as an essential attribute of its existence." (*Id.* at p. 472.)  The "distinction between regulation and taxation," said the court, "has been uniformly maintained," and the court did not discern anything in the state liquor licensing and regulatory scheme that limited the taxing power of charter cities. (*Id.* at pp. 472–473.)  Further, in examining the nature of the tax, the court pointed out "the subject of the tax under the ordinance is the transaction of sale; the purchaser or consumer is made the taxpayer, and the retailer acts only as the tax collector, responsible for remitting it to the taxing authority." (*Id.* at p. 474.)

As for the recordkeeping and remittance provisions of the local sales tax ordinance, they appeared "reasonably adapted to insure collection and proper remission of the tax" and, thus, constituted "an accounting standard coincident with the city's taxing power rather than regulation exclusively reserved to the state in the exercise of its police power over the liquor traffic." (*Ainsworth*, *supra*, 34 Cal.2d at p. 476.)  Indeed, said the high court, "[t]he field of taxation is replete with examples of a governmental entity making businesses generally its agent in tax collections and prescribing certain regulations in the accounting therefor, although such businesses are not subject to 'regulations' by the governmental body in any sense comparable to that use of the term, for example, in our state constitutional provision relative to the intoxicating liquor businesses such as withholding taxes and social security taxes for the United States government, unemployment taxes and numerous excise taxes for the state . . . ." (*Id.* at p. 477.)

In my view, *Ainsworth* articulates two relevant points:  (1) charter cities have "plenary power" to impose local taxes, and (2) requirements to collect and remit a local tax are not "regulation" of the collecting entity in the sense that term means control and oversight of the entity's business.  In other words, even if the state has exclusive

10

regulatory authority over the business engaged in by the collecting entity, that entity can still be required to collect and remit a valid local tax. *Ainsworth* did not, however, involve the collection of a local tax by a state entity.

In *Rivera v. City of Fresno* (1971) 6 Cal.3d 132, disapproved on another ground in *Yamaha Corp. of America v. State Bd. Of Equalization* (1998) 19 Cal.4th 1, 9 (*Rivera*), city users of telephone, gas, and electrical services sought to invalidate a local utility tax, which was collected by the utilities. Observing that "some forty or more cities" imposed this kind of tax (*id.* at pp. 134–135), our Supreme Court prefatorily stated that, as a charter city, Fresno was "empowered to exercise full control over its municipal affairs, unaffected by general laws on the same subject matters and subject only to limitations found in the Constitution and the city charter." (*Id.* at p. 135.) The principal issue in the case was whether the utility tax was a statutorily prohibited local sales or use tax, and the court concluded it was not. (*Id.* at pp. 135–139.) The court also rejected the assertion the tax "invade[d] the field of regulation of public utilities which has clearly been preempted by the state under applicable provisions of the California Constitution." (*Id.* at p. 139.) "[W]hether or not the state has occupied the field of regulation," said the court, "cities may levy fees or taxes solely for revenue purposes, as was done by the Fresno utility users' tax." (*Ibid.*) "Further, the requirement that the utility company supplying a particular utility service collect the utility users' tax and remit to the city does not constitute forbidden or conflicting regulation of the utility." (*Ibid.*)

What seems most significant about *Rivera* for purposes of the instant case is its reiteration of the point made in *Ainsworth*, that requiring an entity to collect a valid local tax imposed on third parties does not infringe on the state's regulatory power over that entity, nor does it "constitute forbidden or conflicting regulation" of that entity. (*Rivers*, *supra*, 6 Cal.3d at p. 139.) *Rivera* did not, however, address whether any of the utilities were state entities and whether, as such, they could object to collecting the local tax on sovereign immunity grounds.

In *City of Los Angeles v. A.E.C. Los Angeles* (1973) 33 Cal.App.3d 933 (*A.E.C. Los Angeles*), a charter city sought to collect a gross receipts tax from an electrical

11

contractor that did business with state entities, including local school districts. The contractor variously claimed that, as to receipts from its state contracts, the tax was tantamount to an impermissible regulation of the state's improvement of its property and therefore it was "entitled to the state's immunity from local regulation and taxation." (*Id.* at p. 939.) "The fatal flaw in Taxpayer's argument," said the appellate court, "is its failure to recognize that the Los Angeles City business tax is a revenue and not a regulatory measure and that the imposition of the tax upon a contractor doing business with the state is a tax upon the contractor and not the state." (*Ibid.*) Stating a "municipal taxing scheme is [] valid unless preempted by state law or prohibited by constitutional principles" (*ibid*), the court held no statute or constitutional provision preempted the city's local tax. (*Id.* at p. 940.)

The *A.E.C. Los Angeles* court went on to explain that "[w]hile local ordinances may not impose a regulatory scheme upon private persons which operates to impinge upon the sovereign power of the state (*Hall* [, *supra*,] 47 Cal.2d [at p.] 183 . . .), revenue measures of general application imposing a nondiscriminatory tax upon persons doing business in a state regulated activity or with the state, do not so impinge." (*A.E.C. Los Angeles*, *supra*, 33 Cal.App.3d at p. 940.) Furthermore, "the fact that a municipal tax is imposed in a fashion which permits its ultimate economic burden to be passed on to a higher governmental unit [e.g., the contractor charges the state entity a price that recoups the local tax] does not invalidate it." (*Ibid.*) The court additionally explained that the fact the contractor was required to obtain a registration certificate showing compliance with the local tax was not an impermissible "regulation" of its contracting business impinging on the state's exclusive regulatory control of such contractors. "The document is required not to regulate but to expedite the collection of revenue." (*Ibid.*) "Since no regulatory purpose is served by the questioned provisions of the Los Angeles Municipal Code and since Taxpayer as an independent contractor to the state cannot appropriate to itself the state's immunity from local taxation," the court concluded the city could impose its tax on receipts from state contracts. (*Id.* at pp. 940–941.)

12

In my view, *A.E.C. Los Angeles* makes a number of relevant points: (1) a charter city's local tax measure is valid unless prohibited by the state constitution or preempted by conflicting state law addressing a matter of statewide concern; (2) there is a critical distinction between a tax imposed directly on the state and a tax imposed on a third party doing business with the state (including a third party doing business with the state in connection with its sovereign activity of building and maintaining its property); (3) an independent contractor does not automatically share the state's immunity from local taxation; (4) there is a distinction (as explained in *Ainsworth* and *Rivera*) between administrative requirements that insure payment of a local tax and the state's "regulation" of how an entity conducts its business; and (5) the fact taxation of a third party may result in an indirect burden on the state or a state entity (e.g., through a higher contract price to cover the local tax), does not invalidate the local tax.

This brings me to *City of Modesto*, *supra*, 34 Cal.App.3d 504, one of the two cases that have been at the center of the debate between the city and the state universities in this case. *City of Modesto* involved another charter city utility tax imposed on local users of water, gas, electricity and telephone services. (*Id.* at p. 506.) Two irrigation districts, which were state agencies and sold electricity as well as water, were among the utilities required to collect and remit the tax. The districts did not dispute that the city had the power to impose the local tax, no doubt given *Rivera*, in which the Supreme Court upheld a charter city's utility tax against statutory and preemption challenges. Rather, the districts claimed they could not be compelled to collect the tax "because the ordinance, to the extent that it applies to them, impinges on the state's sovereignty over local entities; they assert that the collection requirement of the city ordinance is a regulation and that this regulation, if extended to state agencies, contravenes the almost universal rule . . . that the activities of the state and its agencies cannot be controlled or regulated by local entities in the absence of legislative consent." (*Ibid.*) Thus, the *City of Modesto* court was required to address the sovereign immunity question that was neither raised nor addressed in *Rivera.*

13

The appellate court first stated the districts' position ran counter to "the doctrine of stare decisis," citing two California Supreme Court cases. (*City of Modesto*, *supra*, 34 Cal.App.3d at p. 506.) These cases held (a) irrigation districts that generate electricity are engaged in a proprietary activity in competition with other public service corporations (*Yolo v. Modesto Irr. Dist.* (1932) 216 Cal. 274, 278 (*Yolo*)),[5] and (b) an ordinance requiring a utility to collect a city's tax on users does not "constitute forbidden or conflicting regulation of the utility" (*Rivera*, *supra*, 6 Cal.3d at p. 139). (*City of Modesto*, at pp. 506–507.) The court did not discuss the fact *Yolo* involved an irrigation district's governmental immunity defense to a tort action or that *Rivera* dealt with an asserted statutory bar to the local utility tax and preemption, not sovereign immunity. Rather, the *City of Modesto* court simply concluded that if both of these propositions were so, "how can it be argued plausibly that the collection requirement of respondent's ordinance, if applied to that proprietary activity, is regulation which impinges on the state's sovereignty[?]" (*Id.* at p. 507.) The court then went on to defend its reliance on *Yolo*, which the districts claimed was no longer a controlling precedent. (*Id.* at pp. 506–508.)

Presumably, the *City of Modesto* court could have stopped there, but it did not. Instead, it stated: "We affirm the judgment for another reason." (*City of Modesto*, *supra*, 34 Cal.App.3d at p. 508.) While the majority views this reason as an "alternative" rationale that is mere dicta, it is not at all clear that that is the case. While the appellate court clearly believed the combination of *Yolo* and *Rivera* provided sufficient authority to affirm, the opinion can also be read as ultimately affirming "for another reason."

In any case, the *City of Modesto's* other reason is grounded on three points which neither the majority, nor any subsequent case, has questioned: one, a charter city's power to "levy a utility user's tax is a municipal affair and stems from the Constitution" (citing Cal. Const., art XI, § 5 and *Rivera*, *supra*, 6 Cal.3d at p. 135); two, such a city "has no

---

[5] The appellate court did not address the fact the utility tax also applied to water service, even though that would seemingly have been within the districts' governmental function. The irrigation districts may have supplied water only to municipal water districts, however, and not directly to city users.

14

practical nor economical means of collecting such a tax without the cooperation of the supplier of the utility service"; and three, "[i]t is basic that the power to tax carries with it the corollary power to use reasonable means to effect its collection." (*City of Modesto*, *supra*, 34 Cal.App.3d at p. 508.) The court, thus, concluded the charter city's constitutionally grounded power to impose and collect a local utility tax took precedence over the irrigation districts' state sovereign immunity. (*Id.* at p. 508.) "While irrigation districts may be state agencies, they are nevertheless creatures of the Legislature, and like the Legislature must submit to a constitutional mandate; the California Constitution is the paramount authority to which even sovereignty of the state and its agencies must yield." (*Ibid.*) "It follows," then, said the court, "that the collection requirement of respondent's ordinance, though applicable to state agencies, is a reasonable exercise of the city's constitutional power to tax for revenue purposes." (*Ibid.*) The court also dismissed the districts' assertion that collection would be a burden. "[T]he districts are merely conduits for the collection of the city's tax; they are not liable for the tax itself or the cost of collection; the trial court has ordered the city to reimburse the districts for all costs incurred in the collection process." (*Id.* at pp. 508–509.)

There is no question, then, that *City of Modesto* rejected a sovereign immunity defense raised by state entities to collecting a local tax imposed not on the entities, themselves, but on third parties doing business with the state entities.

While the majority views *City of Modesto's* holding as limited to its stare decisis rationale, which, in turn, points out the utility tax was imposed on third parties in connection with a proprietary activity (the irrigation districts' sale of electricity), I am not persuaded the court's stare decisis rationale is necessarily its holding. It appears equally plausible to me that the court ultimately grounded its affirmance on its power-to-tax-includes-power-to-collect rationale, which makes no mention of any distinction between a state entity's proprietary activity and governmental function when it comes to a general tax imposed on third parties. Indeed, if a *general* local tax cannot be imposed on third parties in connection with an activity within a state entity's governmental function and for which it charges a fee, then the problem in the instant case is not merely one of

15

collection, but rather, it is the validity of the tax, itself, as to such third parties. And if that were the case, then third parties doing business with the state in connection with any governmental function (and who are *not* agents of the state) would essentially "share" the state's sovereign immunity from local taxation, a proposition seemingly rejected in *A.E.C. Los Angeles*, *supra*, 33 Cal.App.3d at pp. 939–940.

The majority also distinguishes *City of Modesto* on the ground the irrigation districts were legislatively created state entities, whereas the instant case involves state universities whose existence is rooted, in varying degrees, in our state constitution. However, the sovereignty of any state entity, be it created by constitution or by statute, is, at its core, derived from the sovereignty of the *State of California*. Thus, while it is true the Regents of the University of California is largely an independent entity (a " ' "public trust" ' " that has been characterized as " ' " 'branch of the state itself' " ' " (*Goldbaum v. Regents of University of California* (2011) 191 Cal.App.4th 703, 709)), its sovereignty derives from that of the *state* as imparted to it by the *state constitution*.[6] (*Ibid.* [the Regents is "not entirely autonomous" and "[t]he Legislature may regulate the Regents' conduct in three areas"[7]].) The Legislature, another branch of the state, also gives effect to the *state's* sovereign immunity, including waiving it as it sees fit. (See *Razeto v. City of Oakland* (1979) 88 Cal.App.3d 349, 352 [after Supreme Court "eliminated" sovereign immunity, the Legislature commissioned study "to develop legislation insuring the preservation of necessary sovereign immunity"].) State districts and agencies, in turn, like the California State University, also share in the *state's* sovereign immunity, as afforded to them by the state Legislature. (See *Lofchie*, *supra*, 229 Cal.App.4th at

---

[6] "The University of California was originally a corporation, with the Regents as its board of directors." (*People v. Lofchie* (2014) 229 Cal.App.4th 240, 248, fn. 5 (*Lofchie*).) After controversy arose between political factions seeking to control the university's governance and curriculum, it was given constitutional stature to promote academic independence. (*Ibid.*)

[7] In nearly all other respects, the Regents has a " 'general immunity from legislative regulation.' " (*Lofchie*, *supra*, 229 Cal.App.4th at p. 249, quoting *San Francisco Labor Council v. Regents of University of California* (1980) 26 Cal.3d 785, 788.)

16

pp. 248–250 & fn. 6; *Western Title Guar. Co. v. Sacramento & San Joaquin Drainage Dist.* (1965) 235 Cal.App.2d 815, 820.)  Indeed, the *City of Modesto* court made no distinction between the state Legislature and the irrigation districts in terms of their sovereign immunity.  The districts, said the court, "*like the Legislature* must submit to a constitutional mandate," namely, a charter city's "constitutional power to tax for revenue purposes."[8]  (*City of Modesto*, *supra*, 34 Cal.App.3d at p. 508, italics added.)

In any case, given the fundamental points undergirding *City of Modesto's* power-to-tax-includes-power-to-collect rationale, I think *City of Modesto* has greater significance than the majority credits.  In my view, that court properly concluded the state's sovereign immunity is not impinged by (or, as the court phrased it "must yield" to) an otherwise valid exercise of a charter city's constitutionally secured power to tax—a power that "necessarily includes" the ability to use reasonable means to collect, at least where the city reimburses the state entity's collection costs, as San Francisco represents it will do here.

Moving on from *City of Modesto* brings me to *Oakland Raiders v. City of Berkeley* (1976) 65 Cal.App.3d 623 (*Oakland Raiders*).  In that case, a National Football League team that played at the University of California at Berkeley's stadium, sued the city, claiming its local license tax based on gross receipts was a "regulatory rather than a revenue-raising measure" and, thus, was "an improper regulation" of the university's use of its property.  (*Id*. at p. 626.)  While recognizing that the Regents "is not subject to local regulations with regard to its use or management" of its property, citing *Hall*, the appellate court explained, as prior cases had done, that " 'whether or not the state law has occupied the field of regulation, cities may tax businesses carried on within their

---

[8]  Moreover, because the Board of Trustees of the California State University—an entity largely created, and extensively controlled, by the Legislature—is also a defendant in this case, *City of Modesto* cannot be distinguished on the ground it involved only legislatively created state entities. (See *Lofchie*, *supra*, 229 Cal.App.4th at p. 248–249, fn. 6 ["In contrast [to the Regents], the Legislature possesses comprehensive powers of regulation over the California State University, which ' " 'is subject to full legislative control, and has "only such autonomy as the Legislature has seen fit to bestow." ' " ' "].)

17

boundaries . . . .' " (*Ibid.*) "A tax upon the operation of a business by a lessee of publicly owned property constitutes a tax upon the privilege of performing the business rather than a tax upon the property." (*Id.* at p. 627.) And where one operating under a government contract or lease is taxed like any other contractor or lessee, " 'there is no sufficient ground,' " said the court, " 'for holding that the effect upon the Government is other than indirect and remote,' " citing *Helvering v. Mountain Producers Corp.* (1938) 303 U.S. 376, 386–387 (*Helvering*).[9] (*Oakland Raiders*, at p. 627.) Moreover, "the fact that a tax may constitute an indirect burden upon an organ of government does not invalidate the tax." (*Ibid.*) Nor does the "mere fact that a [local] tax has a collateral effect of regulating an activity" conducted on public property. (*Id.* at p. 628.)

*Oakland Raiders*, thus, reaffirmed several points being developed in the line of cases dealing directly with the interplay of municipal taxing power and the state's sovereignty, including that: (1) taxing a third party contracting with a state entity is fundamentally different from taxing a state entity, itself; (2) a local tax of general application imposed on a third party is not a "regulatory scheme" interfering with the state's regulatory authority over its own property or over the third party's business activities; and (3) the fact a local tax on a third party may impose an indirect burden on the state, or have a collateral regulatory effect on a third party's use of state property, does not invalidate the local tax.

_____

[9] *Helvering* is one of the early United States Supreme Court cases examining the scope of what came to be called "intergovernmental tax immunity," shared by the federal and state governments. In *Helvering*, an energy lessee claimed, among other things, that it was effectively a state instrumentality and, thus, was not subject to federal income tax. (*Helvering*, *supra*, 303 U.S. at p. 383.) The Supreme Court rejected this argument, commenting "the power to tax should not be crippled 'by extending the constitutional exemption from taxation to those subjects which fall within the general application of non-discriminatory laws, and where no direct burden is laid upon the governmental instrumentality, and there is only remote, if any, influence upon the exercise of the functions of government.' " (*Id.* at p. 385, quoting *Willcuts v. Bunn* (1931) 282 U.S. 216, 225.)

18

The majority discounts *Oakland Raiders* as embracing the regulatory versus tax distinction subsequently rejected by our Supreme Court in *California Federal.* But that is not the case. As I shall discuss more fully, *California Federal* addressed a different problem—the dual *preemption* analyses that had developed in the courts of appeal, depending on whether a challenged local ordinance was a tax or a regulatory measure, and which essentially had made local tax measures inviolable as against a preemption challenge. (*California Federal*, *supra*, 54 Cal.3d at pp. 13–18.) Indeed, a comparison of the fundamental taxation principles relied on in *Oakland Raiders*, and the preemption principles explicated in *California Federal*, shows the cases involved different issues and reached conclusions that are not at odds with one another.

Our Supreme Court took up the issue of local taxation of third parties again in *Weekes*, *supra*, 21 Cal.3d 386. In that case, individuals employed within the bounds of a charter city challenged an " 'employee license fee' "—or a "privilege tax" (*id.* at pp. 390, 395)—imposed by the city on the " 'privilege of engaging in or following any business, trade, occupation or profession as an employee.' " (*Id.* at p. 390.) In the vernacular, this kind of tax was called a " 'commuter's tax,' " designed to insure individuals working, but not residing, in a city pay some share of the cost of municipal services. (*Id.* at p. 413 (dis. opn. of Thompson, J.).) The individuals claimed the tax was, in actuality, a statutorily prohibited local income tax. (*Id.* at p. 390.) The city disagreed and further maintained that even if the tax was an income tax, its constitutionally secured taxing power could not be infringed by the state Legislature. (*Id.* at pp. 390–391.) The Supreme Court concluded the city's revenue measure was not an income tax and, thus, did not reach the issue of whether the statute impermissibly constrained the city's home rule powers.

At the end of its opinion, the high court "also conclude[d]" the city was "not barred from imposing its license tax upon state employees who work within the city," citing to *Graves v. N.Y. ex rel. O'Keefe* (1939) 306 U.S. 466, 486–487 (*Graves*). (*Weekes*, *supra*, 21 Cal.3d at p. 398.) In *Graves*, the United States Supreme Court held intergovernmental tax immunity did not bar states from imposing an income tax on federal workers. The court did not consider whether the federal government could refuse,

19

on sovereign immunity grounds, to collect and remit an otherwise permissible state income tax.

The city ordinance upheld in *Weekes*, however, in addition to taxing individuals working within the city, "require[d]" employers, which included the state, to withhold the tax from employee wages. (*Weekes*, *supra*, 21 Cal.3d at p. 398.) The majority does not view this fact as being of any note, pointing out the state was not a party in *Weekes* and the state can waive its sovereign immunity. That is true. But upholding the local tax as to state employees would have been pointless if the city could not expect the tax to be collected by the state. Thus, in my view, *Weekes* at least inferentially suggests that collecting a valid local tax is not an impingement of the state's sovereignty. It also suggests third parties can be taxed in connection with their participation in a governmental function, as some of the state employees taxed by the city in *Weekes* must have been delivering services within the state's governmental function. In short, I cannot square the *result* in *Weekes*—the state collecting a valid local tax imposed on its own employees—with the majority's conclusion, here, that the state universities need not collect a valid parking tax imposed on third parties, even though the schools will be reimbursed their costs of collection.

The next legal decision of note is an Attorney General opinion concluding a charter city could require the State Park System's agent operating the Asilomar conference center to collect a local occupancy tax from those using the center. (65 Ops.Cal.Atty.Gen., *supra*, at pp. 269–271.) The Attorney General recognized that ordinarily the state and its agents are exempt from taxation unless the Legislature consents, but the tax in question was "an excise tax upon the occupant and not upon the proprietor." (*Id.* at p. 269) Thus, the "sole issue" was whether "the state or its agent may be required to *collect* the tax for and on behalf of the city." (*Ibid.*) The Attorney General concluded this was permissible, citing to *City of Modesto* and specifically to the appellate court's power-to-tax-includes-power-to-collect rationale. (*Id.* at pp. 270–271.) The Attorney General did not discuss whether the state was engaged in a proprietary activity or a governmental function, and this might well have presented a close question given

20

that Asilomar was built as a contemplative retreat and was substantially gifted to the state to preserve its iconic character and continue as a " 'Refuge by the Sea.' " (Asilomar Conference Grounds, Park History <http://www.visitasilomar.com/discover/park-history/> [as of May 25, 2017].[10])[11]

This brings me to *California Federal*, *supra*, 54 Cal.3d 1, in which our Supreme Court rectified what had become an overly indulgent view of charter city taxing power

---

[10] Asilomar was built by the Young Women's Christian Association (YWCA) commencing in 1913. Many of its building were designed by architect Julia Morgan, and those buildings designed by Morgan are designated National Historic Landmarks. (Asilomar Conference Grounds, Park History <http://www.visitasilomar.com/discover/park-history/> [as of May 25, 2017].)

[11] The Attorney General concluded the State Park System's lessee operating cabins and a lodge at Pfeiffer Big Sur state park could also be required to collect a county occupancy tax. However, the Attorney General used a different analysis given that the county's taxing authority derived largely from statute. (65 Ops.Cal.Atty.Gen., *supra*, at p. 271–272.) The Attorney General invoked the principle that while the state and its agencies generally are not included within the general provisions of an authorizing statute, this exclusion only applies if their inclusion "would result in an infringement upon sovereign powers." (*Id.* at p. 273.) Thus, as to the county tax, the Attorney General examined whether the Big Sur cabins and lodge were "an integral facet of" a state park's "exercise of sovereign power" and concluded they were not. (*Id.* at pp. 273–274.) Since the lodging was "operated by the state in a proprietary capacity," the Attorney General concluded its agent could be required to collect the statutorily authorized local tax. (*Id.* at p. 274.) Thus, in contrast to the Attorney General's analysis of the charter city's occupancy tax, his analysis of the county's tax depended on the state entity being engaged in a proprietary activity, even though the tax was a general one imposed on third parties and not on the state, itself (or on its agent).

In my view, the Attorney General's struggle with the county tax reflects the absence of a cogent analytical template that allows the courts to evaluate the role of a state entity in collecting a general local tax imposed on third parties. Indeed, the Attorney General's limited view of the Park System's governmental function at Big Sur is difficult to square with the generous view of governmental function more recently embraced in *Bame* and taken by the trial court and majority here. (*Bame*, *supra*, 86 Cal.App.4th at pp. 1356–1357.) I do not disagree with this broader view of governmental activity, but I do note that in applying intergovernmental tax immunity, the federal courts take a *much* narrower view of what governmental activity is immune from taxation. (E.g., *New York v. United States* (1946) 326 U.S. 572, 581 [upholding federal tax imposed on state in connection with its bottling and sale of mineral water].)

21

vis-à-vis conflicting state enactments. In that case, a charter city sought to collect an annual license fee from a financial corporation, which, by statute, was subject to a state income tax in lieu of any other taxes and license fees. (*Id.* at p. 6.) The trial court ruled the taxation of such corporations was a matter of statewide concern and the city's tax was, therefore, preempted as to such corporations. The Court of Appeal, following a trend that had developed in the appellate courts, reversed, ruling charter city "tax measures" are "municipal affairs" and "invariably are immune from state legislative supremacy." (*Ibid.*)

The Supreme Court reversed, rejecting the notion that in considering a preemption claim there is any distinction between local "regulatory" and local "tax measures." (*California Federal*, *supra*, 54 Cal.3d at pp. 13–14 [to extent courts had "made city powers of taxation forever sacrosanct" leading the courts of appeal "to fracture" municipal affairs into "two halves" (i.e., revenue and regulatory matters), that "duality" was "illusory"], at p. 15 ["we find no reason in any policy underlying the municipal home rule provision why the subject of charter city taxation should merit treatment different from charter city regulatory measures"].) Whether a regulatory or tax measure, the fundamental inquiry as to preemption concerns the "limits on a charter city's sovereignty." (*Id.* at p. 13.) Accordingly, the problem before the high court was "that of adjusting the conflict between the effects of the City's business license tax and the Legislature's asserted interest in the uniform taxation of commercial banks and financial institutions." (*Id.* at p. 15.)

Our Supreme Court then set forth the proper approach for resolving true conflicts between state laws and otherwise permissible charter city enactments. (*California Federal*, *supra*, 54 Cal.3d at pp. 16–18.) "[A] court asked to resolve a putative conflict between a state statute and a charter city measure initially must satisfy itself that the case presents an actual conflict." (*Id.* at p. 16.) If it does, the court must then make the "bedrock" determination of whether the state statute addresses a matter of "statewide concern." (*Id.* at p. 17.) In making that determination, the court "should avoid the error of 'compartmentalization,' that is, of cordoning off an entire area of governmental

22

activity as either a 'municipal affair' or one of statewide concern." (*Ibid.*) Rather, what the court must determine is whether "the state has a more substantial interest in the subject than the charter city." (*Id.* at p. 18.)

Thus, when "[w]hen a court invalidates a charter city measure in favor of a conflicting state statute, the result does not necessarily rest on the conclusion that the subject matter of the former is not appropriate for municipal regulation. It means, rather, that under the historical circumstances presented, the state has a more substantial interest in the subject that the charter city." (*California Federal*, *supra*, 54 Cal.3d at p. 18.) After canvassing the history of the state's control of financial institutions, the high court concluded the statute at issue concerned a matter of statewide concern and, as to financial corporations, took precedence over the city's local tax. (*Id.* at pp. 18–24.)

In my view, the Supreme Court's preemption analysis set forth in *California Federal*—which applies to any local ordinance, regardless of whether it is a local tax or regulatory measure—is not inconsistent with the court's earlier rulings in *Rivera* and *Ainsworth* that the imposition and collection of local taxes is not impermissible "regulation" in conflict with the state's sovereign regulatory authority. (*Rivera*, *supra*, 6 Cal.3d at p. 139; *Ainsworth*, *supra*, 34 Cal.2d at pp. 472–473; see *Oakland Raiders*, *supra*, 65 Cal.App.3d at pp. 626–628; *City of Modesto*, *supra*, 34 Cal.App.3d pp. 506–507; *A.E.C. Los Angeles*, *supra*, 33 Cal.App.3d at pp. 939–940.) Indeed, the high court expressly distinguished *Ainsworth* as holding that the state's exclusive regulatory control of liquor sales did not foreclose the local taxation of third parties or collection of such a tax by regulated entities. (*California Federal*, *supra*, 54 Cal.3d at p. 14, fn. 12.)

There is no question that under *California Federal* a local tax imposed on a third party (and its collection) *is* preempted if there is an actual conflict with state law and that law addresses a matter of statewide concern. However, there is no such issue here, as the parties have assumed the City's local parking tax is valid for purposes of the universities' sovereign immunity claim. Rather, the issue here is whether the state universities can be asked to collect the local tax from third parties, particularly where their costs of doing so will be reimbursed.

23

In *Eastern Mun. Water*, *supra*, 31 Cal.App.4th 24, a municipal water district that provided water and sewer services to city residents refused to collect a local tax on those services. (*Id.* at pp. 26–27) The water district, a state entity, did not claim the local ordinance impinged on state sovereignty, but "only that there was no statute" authorizing general law cities to require collection of a local tax. (*Id.* at p. 30.) The appellate court nevertheless discussed *City of Modesto* at some length. (*Id.* at p. 29.) This included paraphrasing that court's discussion of *Yolo*, *supra*, 216 Cal. at p. 274, as concluding "irrigation districts such as appellants [are] engaged in proprietary activity." (*Eastern Mun. Water*, at p. 29.) In fact, *City of Modesto* did make such a blanket statement, but said that in providing electricity, irrigation districts engage in a proprietary activity. (*City of Modesto*, *supra*, 34 Cal.App.4th at pp. 506–507.) This paraphrase also ignored that the district before the *Eastern Mun. Water* court was a municipal *water* district whose governmental functions *are* to provide water and sewer services directly to city users. (Wat. Code, §§ 71610 [authorizing water districts to supply water], 71670 [authorizing water districts to construct and operate sewage facilities].)

In any case, the appellate court relied on the principles undergirding *City of Modesto's* power-to-tax-includes-power-to-collect rationale to conclude that even a general law city can look to a state water district to collect a local utility tax. "The authorities are uniform in concluding that 'the city's power to levy such tax would include the power to use reasonable means to effect its collection.' " (*Eastern Mun. Water*, *supra*, 31 Cal.App.4th at p. 30, quoting *Ainsworth*, *supra*, 34 Cal.2d at p. 476.) The court also looked to several federal cases, quoting one to the effect that reserving the power to tax also includes reserving the power to collect, as " '[t]he former without the latter would be an empty gesture.' " (*Eastern Mun. Water*, at p. 31, quoting *Ranier Nat. Park Co. v. Martin* (W.D. Wn. 1937) 18 F. Supp. 481, 488, aff'd 302 U.S. 661.)

The majority distinguishes *Eastern Mun. Water* as involving only an issue of statutory construction, pointing out the water district did not raise sovereign immunity. That is true. Nevertheless, *Eastern Mun. Water* is significant for two reasons. First, it reaffirmed the fundamental principles underlying *City of Modesto's* power-to-tax-

24

includes-power-to-collect rationale. Second, there can be no doubt that in providing water and sewer services to city residents, the water district was performing governmental functions—yet, it was still required to collect the city's local tax on those services. Thus, I also cannot square the result in *Eastern Mun. Water*—that state water districts are required to collect a local tax imposed on third parties in connection with their governmental functions—with the majority's conclusion, here, that the state universities need not collect a local parking tax imposed on third parties in connection with a governmental function, and even though the schools will be reimbursed their costs.

Finally, I arrive at *Bame*, *supra*, 86 Cal.App.4th 1346, which is the other principal case, in addition to *City of Modesto*, on which the parties have focused, and which the majority says rejects *City of Modesto's* power-to-tax-includes-power-to-collect rationale and supports the result it reaches here. In *Bame*, a charter city sought to collect a license fee and an admissions tax in connection with certain events conducted under contract for the " 'state institution' " (the district) that conducts the Del Mar Fair and also leases its property to the Del Mar Thoroughbred Club for horse racing. (*Id.* at p. 1351.) Event operators eventually began to refuse to pay the license fee and admissions tax, and the city sued the district seeking a declaration that its local revenue raising measures were valid. (*Id.* at pp. 1353–1354.) The district, claiming its contractors were extensions of itself and thus were imbued with its state sovereignty, raised several defenses, including sovereign immunity and preemption. (*Id.* at pp. 1354–1355.) The city maintained, in turn, that its revenue raising measures were a valid exercise of its constitutional home rule power to tax and, in any case, the district, in contracting with the event operators, was acting "in a 'proprietary' as opposed to governmental capacity." (*Id.* at p. 1355.)

Citing extensively to *Laidlaw*, *supra*, 43 Cal.App.4th 630, which, as discussed, had concluded a local school district could not be required to use a charter city's garbage collector, the *Bame* court stated "[i]n determining whether the District's contractors are exempt from local regulations under the doctrine of sovereign immunity, the relevant inquiry is whether the District acts within its governmental capacity in contracting with these entities." (*Bame*, *supra*, 86 Cal.App.4th at p. 1355.) And, like *Laidlaw*, the *Bame*

25

court explained the city's charter city status "is not pertinent to this analysis." (*Id.* at pp. 1355–1356.) "The issue of sovereign immunity," reiterated the *Bame* court, "is distinct from that of preemption . . . . '[S]tate agencies are indeed immune from . . . local regulation absent an express legislative or constitutional waiver of that immunity.' " (*Id.* at p. 1356, quoting *Laidlaw*, at pp. 638–639.) As for the distinction between proprietary and governmental activity, while it is "no longer applicable to determine governmental tort liability," the *Bame* court agreed it "remains viable in the context of encroachment of municipal regulations." (*Bame*, at p. 1356.)

Looking to the district's statutorily authorized purposes and activities, which included promoting and featuring "all of the industries and industrial enterprises, resources and products of every kind or nature in the state," the *Bame* court concluded that "[g]iven the broad functions and authority granted to the District, . . . its sovereign immunity extends to those private entities with which it leases or contracts in order to put on product exhibitions and shows." (*Bame*, *supra*, 86 Cal.App.4th at p. 1358.) The court next concluded the state had not expressly agreed to the city's licensing fee and admissions tax. (*Id.* at pp. 1359–1361.) Accordingly, the court invalidated the city's ordinance to the extent it imposed "a license fee *on* the entities contracting with the District to put on consumer shows," as it taxed "the District's sovereign activities." (*Id.* at p. 1362, italics added.)

The problem with using *Bame* as an analytical guidepost is its lack of clarity as to the nature of the disputed license fee and admissions tax. Most of its language characterizes the fee and tax as imposed *on* the district's agents (and, thus, effectively, *on* the district, itself). (E.g., *Bame*, *supra*, 86 Cal.App.4th at p. 1351 [Bame, one of the contractors, "sought a refund of fees and taxes paid to the City"], at p. 1352 ["It is undisputed that the admissions tax is 'paid 100% by contractors who put on the events at [the] Del Mar Fairgrounds.' "], at p. 1353 [Bame "alleged that up until 1997 he paid the City a 10 percent admissions tax for conducting his home and garden show"], at pp. 1361–1362 [the provisions of certain horse racing statutes "do not constitute express consent by the state to taxing or regulation of the District or its contractors by the City;

26

thus, "as applied to permit the City to impose an admissions tax on entities contracting with the District to put on consumer shows, [Del Mar Mun. Code,] section 3.08.010 of the ordinance taxes the District's sovereign activities and is invalid and unenforceable"].)

However, other language in *Bame* suggests there was, in fact, a distinction between the license fee and the admissions tax, namely that the former was imposed directly on the event operators (and thus, effectively, directly on the district), while the latter was imposed on those attending events, but was collected by the contractors. For example, the appellate court quoted verbatim an admission by the City of Del Mar that limited the case to contractors putting on non-horse racing events—a significant narrowing of the case. (*Bame*, *supra*, 86 Cal.App.4th at p. 1355.) That admission was as follows: "The City maintains it, 'does not impose a business license requirement on the District or the Del Mar Thoroughbred Club, the association which conducts horse racing and satellite wagering. Nor does the City impose admissions taxes on patrons of the racetrack or the Del Mar Fair.' Given these admissions . . . we do not address the validity of the ordinance to the extent it arguably permits the City to tax or impose fees upon the District itself or Del Mar Thoroughbred Club patrons . . . ." (*Ibid.*) This quoted statement by the city suggests that while the city's licensing fee was, indeed, imposed directly on the district's contractors, its admissions tax was actually imposed on patrons, with the contractors liable for its collection.[12]

In any case, the *Bame* court *did not identify any such distinction* between the disputed licensing fee and admissions tax, but treated both as though they were imposed on the district's agents (and, thus on the district, itself). Given that view of the local revenue measures, the result *Bame* reached—that, regardless of its charter status, the city could not impose the fee and tax *on* the district's agents—is indisputably correct, as no state entity can, itself, be subject to a local tax unless it consents. Given that view of the

---

[12] The same is suggested by the language of the ordinance—that the admissions tax was actually imposed on patrons, but collected and remitted by the contractors, who were liable for the tax if they failed to collect it. (See Del Mar Mun. Code, §§ 3.08.010, 3.08.070, 3.08.080, 3.08.090.)

27

revenue measures, however, *Bame* does not address the issue before us—whether a state entity can be required to collect a general local tax imposed not on the entity, itself, but on third parties doing business with the entity. Thus, contrary to the majority's view, *Bame* does not reject *City of Modesto* or any other third party taxation or collection case––in fact, *Bame* makes no mention of any of these cases. Nor does *Bame* support the result reached by the majority in this third party case.

### *Reconciling the Exempt from Local Regulation and Third Party Tax Cases*

As the foregoing recitation of the exempt from local regulation and the third party tax cases reflects, I am unable to subscribe to the majority's view—that collection of the City's parking tax would constitute impermissible regulation of the state universities' use and maintenance of their property—for several reasons. It disregards the distinction consistently made in the third party tax cases between a local tax imposed *on* a state entity and a general tax imposed on a third party doing business with the entity. (See *Eastern Mun. Water*, *supra*, 31 Cal.App.4th at p. 26 [utility tax on third parties]; *Oakland Raiders*, *supra*, 65 Cal.App.3d at pp. 626–628 [license tax on third parties]; *City of Modesto*, *supra*, 34 Cal.App.3d at p. 506 [utility tax on third parties]; *A.E.C. Los Angeles*, *supra*, 33 Cal.App.3d at p. 939 [gross receipts tax on third parties]; see also *Weekes*, *supra*, 21 Cal.3d at pp. 390–391 [privilege tax imposed on third parties]; *Rivera*, *supra*, 6 Cal.3d at p. 135 [utility tax on third parties]; cf. *Bame*, *supra*, 86 Cal.App.4th at pp. 1361–1362 [characterizing local fee and tax as "on" district's agents].) It disregards the uniform view in the third party tax cases that such a tax does not impermissibly invade the state's exclusive regulatory authority over a collecting entity or a third party (see *Rivera*, at p. 139; *Ainsworth*, *supra*, 34 Cal.2d at p. 472), nor does it constitute impermissible regulation of the state's use of its own property. (See *Oakland Raiders*, at pp. 627–628; *City of Modesto*, at pp. 506–507.) And it disregards the authority upholding local taxes imposed on third parties doing business with the state, even in  connection with the performance of a governmental function (see *Weekes*, at p. 398 [upholding local privilege tax on state employees]; *A.E.C. Los Angeles*, at pp. 939–941 [upholding local gross receipts tax on contractor working on local school projects]), as well as the

28

authorities requiring state entities to collect valid local taxes, including taxes on services within an entity's governmental function (see *Eastern Mun. Water*, at p. 30 [water district required to collect local utility tax on water and sewer services]; cf. 65 Ops.Cal.Atty.Gen., *supra*, at pp. 270–271 [state's agent required to collect local occupancy tax on use of Asilomar]; cf. *Weekes*, at p. 398 [upholding local ordinance imposing tax on all employees, including state employees, that required employers to collect tax]).  In fact, a number of these third party tax cases explain why *Hall's* not-subject-to-local-regulation rational does not apply.  (See, e.g., *Oakland Raiders*, at p. 626; *A.E.C. Los Angeles*, at p. 940.)

Accordingly, in my view, the principles undergirding the *City of Modesto's* power-to-tax-includes-power-to-collect rationale more appropriately resolves the question of a state entity collecting a valid local tax imposed on third parties, particularly where, as here, the state entity will be reimbursed its costs of collection and, thus, will serve as a "mere[] conduit[]" of the tax.  (*City of Modesto*, *supra*, 34 Cal.App.3d at p. 508.)  As our Supreme Court observed in *California Federal*, "the power to levy local taxes in support of local expenditures is an essential function of municipal government." (*California Federal*, *supra*, 54 Cal.3d at p. 13; see *Ainsworth*, *supra*, 34 Cal.2d at p. 472 [the "plenary power of taxation possessed by a chartered municipality [is] an essential attribute of its existence"].)  And as the appellate courts in *Eastern Mun. Water* and *City of Modesto* pointed out, that power is illusory without the power to collect.  (*Eastern Mun. Water*, *supra*, 31 Cal.App.4th at p. 30; *City of Modesto*, at p. 508.)  There is no question that requiring a state entity to collect a local tax brings the respective sovereign spheres of the state and a municipality within harrowingly close proximity.  Nevertheless, it is "the difficult but inescapable duty of the court to, in the words of one authoritative commentator, 'allocate the governmental powers under consideration in the most sensible and appropriate fashion.' " (*California Federal*, at p. 17.)

I find support for a more nuanced view of sovereign immunity—that it is not impinged by collecting a general local tax imposed on third parties, particularly where the costs of such are reimbursed—not only in the principles developed in the third party tax

cases, but also in federal tax cases (which our appellate courts have cited as supporting authority in a number of the third party tax cases).

The United States Supreme Court has addressed competing sovereignty claims over taxation in two contexts—disputes between states and the federal government, and between federally recognized Indian tribes and the states. While the source and nature of sovereign immunity attendant to the federal government, the states, and recognized Indian tribes differs, as far as *taxation* within their respective jurisdictional spheres is concerned, each is recognized as a sovereign, with the power and dignity that imports. (See, e.g., *Washington v. Confederated Tribes of Colville Indian Reservation* (1980) 447 U.S. 134, 135–136, 152–154 (*Colville*) ["power to tax transactions occurring on trust lands . . . is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication by their dependent status"; "even if the State's interests were implicated by the tribal taxes . . . it must be remembered that tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States"]; *Graves*, *supra*, 306 U.S. at p. 477 ["The theory of the tax immunity of either government, state or national, and its instrumentalities, from taxation by the other, has been rested upon an implied limitation on the taxing power of each, such as to forestall undue interference, through the exercise of that power, with the governmental activities of the other."]; *Helvering v. Gerhardt* (1938) 304 U.S. 405, 411–422 [discussing evolution of implied constitutional intergovernmental tax immunity].) Thus, while I have no quarrel with the majority's point that federal and state sovereign immunity differ, and that tribal sovereign immunity differs from both federal and state sovereign immunity, when it comes to the power to tax third parties within their jurisdictional borders, the sovereign power of all three is on fairly even footing.

The United States Supreme Court has consistently reaffirmed that one sovereign cannot directly tax another sovereign with respect to its governmental functions. (See, e.g., *United States v. County of Fresno* (1977) 429 U.S. 452, 459 (*County of Fresno*) ["[s]ince *McCulloch* [*v. Maryland* (1819) 17 U.S. 316, 4 Wheat. 316, 4 L.Ed. 579 (*McCulloch*)], this Court has adhered to the rule that States may not impose taxes directly

30

on the Federal Government"].)  It also has repeatedly held, however, that a generally applicable tax imposed by one sovereign on third parties doing business with another sovereign, does not impinge on the latter's immunity, even if the tax indirectly imposes additional costs on the nontaxing sovereign.  (See *County of Fresno*, at p. 462 ["The rule to be derived from the Court's more recent decisions" is that "the economic burden on a federal function of a state tax imposed on those who deal with the Federal Government does not render the tax unconstitutional so long as the tax is imposed equally on other similarly situated constituents of the State."]; *Helvering v. Gerhardt*, *supra*, 304 U.S. at pp. 421–424 [upholding power of federal government to impose income tax on state employees; "[t]he mere fact that the [indirect] economic burden of such taxes may be passed on to a state government . . . infringes no constitutional immunity"].)

The Supreme Court's reasoning in these tax-imposition cases, at bottom, has been that tax revenues are the lifeblood of every sovereign, and sovereigns with overlapping jurisdiction must therefore bear the indirect consequences, including increased costs, necessarily associated with each other's revenue raising measures.  (See *Graves*, *supra*, 306 U.S. at p. 483 [implied constitutional immunity from taxation is narrowly construed because "the expansion of the immunity of the one government correspondingly curtails the sovereign power of the other to tax"].)  "The state and national governments must coexist.  Each must be supported by taxation of those who are citizens of both." (*Helvering v. Gerhardt*, *supra*, 304 U.S. at p. 422.)

While this body of federal cases has consistently upheld taxes imposed by one sovereign on third parties within the overlapping jurisdiction of another sovereign, it has not addressed one sovereign's efforts to persuade another to collect a duly imposed tax.  Moreover, as between the federal government and the states, collection has largely been dealt with by way of statute and reciprocal agreement.  (See, e.g., 5 U.S.C. §§ 5517, 5520

[authorizing Secretary of the Treasury to enter into tax withholding agreements for state and local taxes].**[13]**)

However, the United States Supreme Court has dealt with sovereignty issues associated with the collection of taxes in the context of state efforts to require federally recognized Indian tribes to collect state taxes. The high court has brought the same pragmatic view to this context that has driven its tax-imposition cases—that to insure the mutual survival of sovereigns with overlapping jurisdiction, their respective sovereign immunity necessarily must have some degree of fluidity. Thus, in a series of cases the court repeatedly rejected sovereign immunity defenses by tribes against state efforts to require them to collect state sales taxes. (See, e.g., *Oklahoma Tax Com'n v. Potawatomi Indian Tribe* (1991) 498 U.S. 505, 513 (*Oklahoma Tax Com'n*) ["the doctrine of tribal sovereign immunity does not prevent a State from requiring Indian retailers doing business on tribal reservations to collect a state-imposed cigarette tax on their sales to nonmembers of the Tribe"**[14]**]; *Colville*, *supra*, 447 U.S. at p. 151 ["And the State may impose at least 'minimal' burdens on the Indian retailer to aid in enforcing and collecting the [state] tax."]; *Moe v. Confederated Salish and Kootenai Tribes of Flathead*

---

**[13]** Title 5 of the United States Code sections 5517 and 5520 state, among other things, that they "do not give consent of the United States to the application of" a state statute or local ordinance "which imposes more burdensome requirements on the United States than on other employers"—language which suggests a limited waiver of perceived sovereign immunity. However, I am aware of no federal case holding that, absent consent, one sovereign's collection of another sovereign's ordinary income tax, for example, in and of itself, impermissibly impinges on federal intergovernmental tax immunity. (Cf. *Jefferson County v. Acker* (1999) 527 U.S. 423, 441, fn. 11 [majority responding to dissent's view that local occupational tax imposed on federal judges impermissibly imposed administrative burden on federal court exceeding those associated with ordinary, permissible income tax].)

**[14]** Because tribal sovereign immunity *does* preclude suit against a federally recognized tribe without its consent, the court also held the state could not enforce its collection requirements in court. (*Oklahoma Tax Com'n*, *supra*, 498 U.S. at p. 514.) While the state complained that gave it "a right [to require collection] without any remedy," the court suggested it had other avenues to secure compliance its sales tax law. (*Ibid.*)

32

*Reservation* (1976) 425 U.S. 463, 483 [burden of collecting state tax would not "frustrate[] tribal self-government"].)  Indeed, Justice Rehnquist observed in his concurring and dissenting opinion in *Colville*, "[i]f Indians are to function as quasi co-sovereigns with the States, they like the States, must adjust to the economic realities of that status as every other sovereign competing for tax revenues . . . ."  (*Colville*, *supra*, 447 U.S. at p. 186 (conc. & dis. opn. of Rehnquist, J.).)

The majority dismisses these federal cases as having nothing to do with the state universities' sovereign immunity, let alone the principle that a state entity is exempt from local regulation of its governmental functions.  Certainly, federal and state intergovernmental tax immunity, and tribal sovereign immunity, differ from the state's exemption from local regulation as developed by the California courts.  But this misses the bigger picture—that the United States Supreme Court's pragmatic view that sovereign immunity is not impinged by a minimal burden associated with the collection of another sovereign's lawful tax, is essentially the view reflected by *City of Modesto's* the-power-to-tax-includes-the-power-to-collect rationale.

In my view, this is also the approach that best accommodates the respective sovereign interests of the state and of municipalities in connection with a general local tax imposed on third parties doing business with a state entity.  Under this approach, it does not matter whether that business is arguably within the sphere of a state entity's governmental function (particularly given the current expansiveness of that term (see e.g., *Bame*, *supra*, 43 Cal.App.4th at p. 1358)).  What is significant is whether it is a *general* tax imposed on *third parties* doing business with the state entity, particularly where, as here, the entity will bear no costs of collection.  Accordingly, in my view, the state universities can be required to collect the city's parking tax from those paying to park in their parking lots.

_____

Banke, J.

33

Trial Court:

    San Francisco County Superior Court


Trial Judge:

    Hon. Ernest H. Goldsmith

    Hon. Marla J. Miller


Counsel for Plaintiff and Appellant:

    Dennis J. Herrera; City Attorney

    Jean H. Alexander; Chief Tax Attorney

    Peter J. Keith; Deputy City Attorney


Counsel for Defendant and Respondent

    Kamala D. Harris; Attorney General of California

    Paul D. Gifford; Senior Assistant Attorney General

    Joyce E. Hee; Supervising Deputy Attorney General

    David Lew; Deputy Attorney General

    Robert E. Asperger; Deputy Attorney General

    Benjamin P. Fay, Gabriel McWhirter; Jarvis, Fay, Doporto & Gibson, LLP

    Elise Traynum, General Council; UC Hastings College of the Law

    Charles F. Robinson, Karen J. Petrulakis, Margaret L. Wu; The Regents of the
University of California Office of the General Counsel


*City and County of San Francisco v. Regents of the University of California et al.*
(A144500)

1